Kenton-Walker, Janet, J.
The defendant, Chad Easter (“Easter”), is charged in this indictment with home invasion, armed assault with intent to rob, two counts of armed assault in a dwelling, two counts of assault and battery by means of a dangerous weapon, possession of a firearm while committing a felony, possession of a firearm without an FID card, and possession of ammunition without an FID card. Before the court is the Commonwealth’s motion in limine to admit into evidence hearsay statements made by the two victims, Jessica McKeon (“McKeon”) and Alex Lora (“Lora”). The Commonwealth argues that the statements are admissible under the doctrine of forfeiture *412 by wrongdoing. Commonwealth v. Edwards, 444 Mass. 526 (2005). See also Mass. Guide to Evidence §804(b)(6) (2016). For the following reasons, the Commonwealth’s motion is DENIED.
BACKGROUND
In this case, the Commonwealth alleges that, on November 5, 2013, at approximately 8:00 a.m., two black males, dressed in reflective vests and carrying a clipboard, knocked on the door of Apartment 2L at 15 East Circuit Avenue, Worcester—the home of McKeon and Lora. When McKeon opened the door, the men told her they were from the city’s water department and needed to check the water. McKeon allowed them to enter. Once inside the apartment, the two men displayed firearms and assaulted both McKeon and Lora, demanding drugs and asking for the person who lived in a different apartment. The intruders tried to tie Lora and when he grabbed at the firearm, it went off. Lora sustained a wound to his left middle finger. The two intruders then fled, dropping the clipboard.
McKeon called 911 and Worcester police responded to the scene. McKeon and Lora gave statements to the police. In addition, fingerprint evidence recovered from the kitchen faucet, the clipboard, and papers were analyzed and determined to be consistent with Easter’s known prints. McKeon also identified Easter from a photo array with 50% certainty. Both McKeon and Lora testified before the grand jury and Easter was indicted.
Easter was arraigned in December of 2013. Following a hearing on dangerousness on December 19, 2013, this court (Lemire, J.) ordered Easter held without bail under G.L.c. 276, §58A. In May of 2014, McKeon and Lora were arrested on drug distribution charges. Invoking their Fifth Amendment privilege, McKeon and Lora refused to testify against Easter in this case. In July of 2014, this court (Tucker, J.) reviewed Easter’s status and set bail at $5,000 cash along with pre-trial conditions that Easter was to stay away and have no contact with the victims, maintain employment, and be subject to random drug testing.
In April of 2015, McKeon entered into a cooperation agreement with the Commonwealth in which she was granted immunity from prosecution in exchange for her testimony against Easter. After several pre-trial motions and a number of continuances, the case was scheduled for trial on March 28, 2016.[1]
On March 10, 2016, at approximately 7:30 p.m., McKeon and Lora were shot while at their residence in the second floor apartment at 8 Forbes Street in Worcester. McKeon sustained six gunshot wounds and was pronounced dead at the scene. Lora was shot twice and later died of his wounds at the hospital.
FINDINGS OF FACT
Following an evidentiary hearing,[2] the court makes the following findings of fact.[3]
On February 19, 2016, Easter rented a red Toyota Camiy, license plate number 1HS376 (the “Toyota”), from Hertz rental agency. On February 25, 2016, Easter rented a silver Ford Taurus, license plate number 4GC484 (the “Taurus”), from Avis/Budget rental agency located in Allston (Boston). Both vehicles were scheduled to be returned on March 11, 2016. The Taurus was returned on March 14, 2016.
On March 8, 2016, shortly after midnight, Boston Police conducted a traffic stop of the Taurus. Easter, dressed in blue jeans and a gray hoodie, was the operator of the Taurus. There were two passengers—one in the front seat and one in the back seat. There was no evidence that Easter or the two passengers had been or were engaged in criminal activity at the time of the stop.[4]
Also on March 8, 2016, surveillance video from the Great Brook Valley housing development in Worcester (“Great Brook Valley”) showed the Toyota entering Great Brook Valley shortly before 11:30 p.m. That same surveillance video showed the Taurus entering Great Brook Valley approximately twenty minutes later, and showed the Taurus leaving Great Brook Valley on March 9, 2016 shortly before 1:30 a.m. Easter’s girlfriend lived at Great Brook Valley. Although there is no evidence that Easter was the operator of either vehicle, a reasonable inference can be drawn that two different people operated the vehicles.
Forbes Street in Worcester, Massachusetts is a one-way street that ends at Lincoln Street. 8 Forbes Street is a three-family house owned by Silvio Hernandez, Sr. (“Silvio, Sr.”), and is approximately 180 feet from the corner of Lincoln Street. As one faces 8 Forbes Street, there is a vacant lot to the left of the house. Silvio, Sr.’s son, Silvio Hernandez, Jr. (“Silvio, Jr.”), lives on the first floor. McKeon and Lora were tenants and lived in the second-floor apartment. Silvio, Sr., his wife, and his sister, Yolanda Jilek (“Yolanda”), live in the third-floor apartment.
On March 10, 2016, at approximately 7:30 p.m., Silvio, Jr. was watching television in his first-floor apartment when he heard five to six gunshots go off in the hallway on the upper floors. The smoke alarms also went off. Silvio, Jr. called Yolanda on the third floor to see if she was alright, which she was. Silvio, Sr. was not at home at that time. Silvio, Jr. tried to call his father, but was unable to reach him. He then called 911 and reported the gunshots. Prior to the gunshots, Silvio, Jr. did not see or hear anyone entering or leaving the building. He did not hear anyone arguing or talking before the shots. Silvio, Jr. did not hear or see anyone running after the shots. Yolanda had also heard the shots and alarms. She heard people talking and leaving the apartment on the second floor, but did not see anyone leave and did not hear anyone going down the stairs.
In the evening of March 10, 2016, Anthony Richards (“Richards”) was visiting his friends who lived across the street from 8 Forbes Street at 11 Forbes Street. He was on the porch smoking a cigarette when he saw two unknown males wearing black hoodies walk through the *413 vacant lot next to 8 Forbes Street and head toward the front of the house. As he watched the two males enter 8 Forbes Street, Richards observed a SUV pull up and park across the street from 8 Forbes Street. Richards recognized the vehicle as belonging to one of the people who lived at 8 Forbes Street. Richards identified the man who had got out of the SUV as being the second floor tenant because he knew Silvio, Jr. lived on the first floor and Silvio, Sr. lived on the third floor. Silvio, Jr. later identified the SUV as belonging to Lora.
Approximately two minutes after seeing the two men enter the building and the SUV pull up, Richards heard gunshots. He then saw the two males on the second floor landing at 8 Forbes Street. Richards went inside and locked the door. He did not hear any arguing and did not see anyone leave the building.
When the police arrived, they found a pizza box on the front porch of 8 Forbes Street that Silvio, Jr. said had not been there earlier in the evening. The police found McKeon lying face up on the floor in the second floor apartment. She had been shot four times at close range in the head and neck, as well as in the right arm. McKeon also sustained bruising and contusions to her body and face. Lora had been shot twice. One bullet grazed his head; however, Lora suffered a fatal gunshot wound to the back and later died at the hospital. Both victims had been shot with 9mm bullets.
Justin Melendez (“Melendez”) was a friend of Lora’s. On March 10, 2016, he spoke with Lora one and one-half hours to two hours prior to the shooting. Lora was supposed to pick up Melendez that evening to go to Lora’s cousin’s house. Lora did not tell Melendez that he was having any problems with anyone. Lora never mentioned that he was being threatened or pressured not to appear in court. However, Melendez told the police that Lora had been hanging around with an individual affiliated with the Kilby Street gang, known as “Music. ” While Melendez was not sure if “Music” had shot Lora, he believed “Music” had something to do with it.
The police asked Silvio, Sr. if he had any idea who had done the shooting. Silvio, Sr. told the police that he believed Lora was dealing drugs and that there were people coming in and out at all times of the night. He described two of the individuals who came over regularly as being dressed like street gang members. Silvio, Sr. also told the police that Lora smoked marijuana eveiy day, McKeon was using drugs, and Lora had fallen behind on the rent.
On March 11, 2016, Elijah Rivera (“Rivera”), aninth grade high school student, took his dog for a walk in the vacant lot next to 8 Forbes Street. Rivera kicked something while walking. When he looked at what he had kicked, he saw it was a black gun. The police were contacted and the gun was determined to be a loaded 9mm firearm. Further investigation determined that the casings found at the shooting scene of McKeon and Lora were the same as the ammunition contained in the firearm found by Rivera.[5]
On March 11, 2016, Marie Mercurio, a probation officer with the Worcester Superior Court responsible for monitoring defendants on pre-trial release, called the number provided by Easter. There was no answer and Ms. Mercurio left a voicemail message for Easter asking him to come in to report. Ms. Mercurio left at least one more message; however, Easter did not respond to the voicemails and did not report as directed. A warrant was issued for his arrest. On March 28, 2016, Easter was arrested on that warrant when he appeared at court for the trial of this case.
Throughout the streets and intersections in the City of Worcester, there are surveillance cameras referred to as license plate readers (“LPRs”). LPRs are used to take pictures of the license plates of vehicles passing by them. In addition to still photographs of the license plates, the LPRs capture video recordings of the vehicles. Approximately three-tenths of a mile from 8 Forbes Street, there is an LPR located on Lincoln Street near the intersection of Catherine Street. At 6:32 p.m. on March 10, 2016, that LPR captured a photograph of the Taurus as it headed south towards the downtown area of the city. There was no evidence that the Taurus came from Forbes Street or that the Taurus passed Forbes Street as it traveled down Lincoln Street.[6] Also, there is no evidence that Easter was driving the Taurus on March 10th when it passed the LPR.[7]
On March 14, 2016, at approximately 8:30 p.m., surveillance video at the Avis/Budget car rental agency in Allston shows a black male wearing a jacket with a hood returning the Taurus.[8] There was no evidence that the man seen in the video was Easter. On March 15,2016 the manager of the agency spoke with Worcester police and told them that an individual identifying himself as Easter had come into the agency saying that he had left his cell phone in the Taurus and needed it back. The manager told Easter the Taurus was not available.[9] A search of the Taurus resulted in no evidence linking the Taurus to the shooting at 8 Forbes Street and no cell phone was found.[10]
Based on the credible testimony from Breed and Baez, Easter used an alias of “Corey” Easter in the past with the Worcester police. Easter is a friend of an individual named Dariyl Thomas (“Thomas”).[11] In March of 2016, Thomas was incarcerated at MCI Cedar Junction. On an inmates call list maintained by the prison for Thomas, the phone number of 774-262-1303 was listed, and described as “Corey Easter— Friend.” The police learned that the phone number 774-262-1303 was from a Sprint account held in the name of Erica Landers, who is Thomas’ girlfriend.[12]
Cell phone site location data revealed that the phone with the 774-262-1303 number was in Worcester at various times every day from March 1, 2016 through March 9, 2016, with the exception of March 3, 2016. Those same records revealed that the 774-262-1303 phone was in Boston around 3:10 p.m. on March 10, 2016. The next record showing the whereabouts of the *414 774-262-1303 phone is from March 13, 2016 at approximately 1:15 p.m., at which time the phone was in Boston. There was no record of the phone’s whereabouts after 3:10 p.m. on March 10th until 1:15 p.m. on March 13th.
On March 22, 2016, at about 12:20 p.m., Thomas called the 774-262-1303 number from MCI Cedar Junction—the phone number on Thomas’ call list described as “Corey Easter.” A male answered the phone and the two men talked for around half an hour. After listening to the call, Baez, who was familiar with Easter’s voice, identified the male’s voice as belonging to Easter. According to Baez, at one point early in the call, the male identified as Easter allegedly says that he had heard good news about a “hometown hit.” The court listened to the recording many times and, while a few words, including the phrases “some crazy shit,” “real good news,” and “hometown hit,” are decipherable, most of the conversation surrounding those phrases is completely unintelligible. To conclude from this evidence that the men were discussing the shooting of McKeon and Lora is pure speculation and assumption; to then assume that this demonstrates a consciousness of guilt on the part of Easter, or even knowledge by Easter about the specifics of the shooting at 8 Forbes Street, is asking this court to decide this case on no evidence. The court finds this evidence to have no probative value in this matter and, therefore, gives it no weight.
DISCUSSION
In Reynolds v. United States, 98 U.S. 145, 158 (1878), the Supreme Court established the doctrine of forfeiture by wrongdoing: “(t]he Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away.” See also Crawford v. Washington, 541 U.S. 36, 62 (2004) (doctrine of forfeiture by wrongdoing “extinguishes” criminal defendant’s right to confrontation under the Sixth Amendment to the United States Constitution). The Court explained that the doctrine of forfeiture by wrongdoing “has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong[.J” Reynolds, 98 U.S. at 159.'
Adopting the doctrine of forfeiture by wrongdoing in Edwards, the Supreme Judicial Court determined that a defendant may forfeit his right to object to the admission of hearsay evidence under art. 12 of the Massachusetts Declaration of Rights and rules of evidence. 444 Mass, at 536. The court ruled that three factual findings were required for forfeiture by wrongdoing to apply: “(1) the witness is unavailable; (2) the defendant was involved in, or responsible for, procuring the unavailability of the witness; and (3) the defendant acted with the intent to procure the witness’s unavailability.” Id at 540.
The doctrine clearly applies in cases where a defendant murders, threatens or intimidates a witness in an effort to procure that witness’s unavailability. Id. at 537. However, “[a] defendant’s involvement in procuring a witness’s unavailability need not consist of a criminal act”; the “wrongdoing” in forfeiture by wrongdoing is simply the intentional act of making the witness unavailable to testify or helping the witness become unavailable. Id. at 540-42. Forfeiture by wrongdoing “may include a defendant’s collusion "with a witness to ensure that the witness will not be heard at trial.” Id. at 540. “The Commonwealth need not show that the defendant threatened, coerced, persuaded, or pressured a witness to avoid testifying, or physically prevented the witness from testifying.” Commonwealth v. Szerlong, 457 Mass, 858, 860-61 (2010) (citation omitted).
Before a determination that there has been a forfeiture by wrongdoing, the court must conduct a hearing so the parties can present evidence, including testimony. Edwards, 444 Mass. at 545. The hearing is not a mini-trial and hearsay evidence may be considered. Id. It is the Commonwealth’s burden to prove a forfeiture by a preponderance of the evidence. Id. at 542. Proof by a preponderance of the evidence requires the Commonwealth to show that the fact it is attempting to prove is more probably true than not true. Sargent v. Mass. Accident Co., 307 Mass. 246, 250 (1940); see also Lisbon v. Contributory Retirement Appeals Bd., 41 Mass.App.Ct. 246, 255 (1996).
The Commonwealth has met its burden of proving by a preponderance of the evidence that McKeon and Lora are unavailable to testify at the trial of this indictment, thus satisfying the first element in the forfeiture by wrongdoing doctrine. The issue is whether or not the Commonwealth has met its burden of showing that Easter was involved in, or responsible for, procuring the unavailability of McKeon and Lora, and that Easter acted with the intent to procure their unavailability.
1. Lora
When Lora asserted his Fifth Amendment privilege in April of 2014, he became unavailable as a witness against Easter. Unlike McKeon, Lora was never granted immunity and never entered into a cooperation agreement with the Commonwealth.[13] At the time of his murder on March 10th, therefore, Lora was already an unavailable witness and his murder did not make him unavailable. Even if this court were to find that Easter was involved in the murder of Lora, Lora’s unavailability as a witness had nothing to do with any purported acts by Easter, Lora’s unavailability was a result of Lora’s asserting a Fifth Amendment privilege.
Because the Commonwealth cannot show by a preponderance of the evidence that Easter was involved in, or responsible for, procuring the unavailability of Lora as a witness, the out-of-court statements made by Lora are not admissible under the doctrine of forfeiture by wrongdoing.
*415 2. McKeon
There is no doubt Easter had a strong motive to prevent McKeon from testifying. McKeon was the only witness expected to identify him as one of the two men who entered the apartment on East Circuit Street on November 5, 2013. Motive, however, is not proof that Easter shot McKeon or was involved in that shooting.
After reviewing the credible evidence found by this court, the Commonwealth has shown by a preponderance of the evidence that: (1) Easter rented the Toyota and the Taurus; (2) Easter was driving the Taurus in Boston shortly after midnight on March 8th; (3) the Toyota and the Taurus were at Great Brook Valley on March 8th just before midnight, with the Taurus leaving Great Brook Valley in the early morning hours of March 9th; (4) Easter’s girlfriend lived at Great Brook Valley; (5) the cell phone with the number 774-262-1303 was in Worcester in various locations during the early part of March, including March 8th and 9th; and (6) Easter had access to and used the cell phone with the number 774-262-1303. From this, the court can draw a reasonable inference that Easter was driving the Taurus in Worcester on March 8th and 9th and was at Great Brook Valley, probably visiting with his girlfriend.
In addition, the evidence, together with the reasonable inferences that can be drawn from that evidence, show that on March 10, 2016; (1) shortly before 7:30 p.m., two men dressed in black hoodies were seen walking across the vacant lot next to 8 Forbes Street and entered 8 Forbes Street just as Lora pulled up in his SUV; (2) the two men wearing the black hoodies shot and killed McKeon and Lora with a 9mm firearm on the second floor of 8 Forbes Street; (3) the killing of McKeon was execution style; and (4) the two men threw the 9mm firearm they used to kill McKeon and Lora into the vacant lot next to 8 Forbes Street. Easter was not identified as being one of the two men wearing the black hoodies.[14] Although Easter has a prior conviction for possession of a 9mm firearm and a 9mm casing was found at the scene of the November 2013 home invasion, 9mm firearms are not uncommon and this evidence is no proof that Easter is linked to the firearm used to kill McKeon and Lora. There was, therefore, no evidence linking Easter to the 9mm firearm used in the shooting on March 10, 2016.
The Commonwealth urges this court to infer that Easter was in the neighborhood at the time of the shooting because the LPR on Lincoln Street captured a picture of the Taurus traveling south on Lincoln Street[15] just three-tenths of a mile from 8 Forbes Street about an hour before the shooting. To do so invites speculation and assumption. The only fact that has been proven is that the Taurus was on Lincoln Street about an hour before the shooting. It does not show that Easter was driving the Taurus. It does not show that the Taurus, let alone Easter, was on Forbes Street or even passed Forbes Street.[16]
The Commonwealth argues that, because the cell phone with the number 774-262-1303 was in Boston on March 10th at 3:10 p.m. and not back in service until March 13th at 1:15 p.m., this is evidence that Easter purposely shut off the phone in order to avoid detection. This argument has no merit and requires conjecture and surmise by the court. While the court believes it is reasonable to draw the inference that Easter used that phone, there is no evidence to support a finding that Easter turned the phone off.[17] While “unusual and suspicious,” the evidence is insufficient to prove by a preponderance of the evidence that Easter turned off the phone to avoid detection.[18]
Finally, it is established, by a preponderance of the evidence, that McKeon and Lora were involved in the use and distribution of illegal drugs. The evidence also showed that Lora was involved with members of a street gang, one of whom may have been responsible for the shooting.
In sum, the Commonwealth has proven by a preponderance of the evidence that McKeon is unavailable because she was murdered. The Commonwealth has failed to sustain its burden in showing by a preponderance of the credible evidence that Easter was involved in, or responsible for, procuring the unavailability of McKeon, and that Easter acted with the intent to procure McKeon’s unavailability.
ORDER
For the foregoing reasons, the Commonwealth’s motion in limine to admit the victims’ out-of-court statements into evidence is DENIED.

 In November 2015, Easter waived his right to a speedy trial, acknowledging that the case was scheduled for trial in March of 2016.

 he court heard testimony from Worcester Police Detectives Elias Baez (“Baez”) and Christopher Breed (“Breed”). In addition, the court reviewed 35 exhibits, which included numerous video and audio recordings, witness statements, telephone records, aerial maps, and other documents. The court notes that much of the evidence was in the form of hearsay, which is permissible in this type of hearing. See Edwards, 444 Mass, at 545. While much of the hearsay evidence was reliable, some was not and, in those instances, the court did not credit that evidence.

 The Commonwealth bears the burden of proving a forfeiture by wrongdoing by a preponderance of the evidence. Edwards, 444 Mass, at 542-43. Therefore, the findings made are by a preponderance of the evidence.

 The Boston Police Field Interview Report states that Easter was an “active Thetford Ave. associate, multiple firearms charges” and that the front seat passenger was “active Thetford Ave. and Rosewood associate, multiple prior firearms charges including discharging.” The back seat passenger was “active Fabyan and Rosewood associate, multiple prior firearms charges.” Because there is no foundation for these hearsay opinion statements, the court does not find this hearsay evidence reliable on the issue of whether or not Easter or the passengers were associated with street gangs, or that the two passengers were known to the Boston Police for violent criminal conduct. Therefore, the Commonwealth has not proven by a preponderance of the evidence that the two passengers were gang members or violent criminals.

 here was also evidence that Easter had a prior conviction for possession of a 9mm firearm and that a casing found at the 15 East Circuit Avenue apartment where the alleged home invasion took place in 2013 was also a 9mm.

 After viewing street maps of the area, the court takes judicial notice that there are many streets between the LPR on Lincoln Street and Forbes Street from which the Taurus could have come from. To conclude that the Taurus was either on Forbes Street before it passed by the LPR, or that it passed by Forbes Street, requires speculation, which this court will not do.

 The Commonwealth also introduced surveillance video taken at 6:34 p.m. on March 10, 2016 from Al’s Prime Energy located at 81 Summer Street, which is approximately half a mile from the LPR on Lincoln Street. According to a hearsay statement, the video purportedly depicts a similar looking Ford Taurus driving by on Summer Street. From this, the Commonwealth asks this court to conclude that it is the Taurus rented by Easter. The court finds the hearsay evidence that the vehicle depicted is in fact a Ford Taurus to be unreliable. The court also finds that, even if this court were to conclude that the vehicle depicted in the A1 Prime surveillance picture is a Ford Taurus, it is improper speculation to conclude that it is the Taurus rented by Easter. This evidence, therefore, is not credible or probative and the court gives it no weight.

 The video also shows that it was raining heavily at the time the Taurus was returned.

 After the police determined that the Taurus had been rented by Easter, they put a BOLO out on the vehicle and contacted the rental agency. On March 11, 2016, the agency recorded in its records that the vehicle had been reported stolen. However, that was not the case.

 The court also viewed the surveillance video from the Allston Speedway gas station across the street from the Avis/Budget car rental agency from March 14, 2016. Baez testified that the video shows the Taurus entering the gas station after a BMW had pulled in. The individuals from the Taurus got out and entered the BMW. After watching that video, the court was able to determine that a blue car was at the pumps and a light colored vehicle, perhaps a silver Taurus, came in afterwards. There is some imagery of at least one or more people between the two vehicles. The video shows a black male maybe coming from the lighter vehicle going into the store to pay for gas, then returning to put gas into the light vehicle. The light vehicle then left, but it is not clear if the male who pumped the gas was also the male who drove the light vehicle out. The court was able to observe that the individual who paid for the gas and pumped the gas was not the same person who returned the Taurus to the rental car agency. However, a few minutes later, the video depicts someone getting into the BMW after the Taurus had been dropped off and driving away. Again, it is unclear from the video if this was the man who had dropped off the Taurus. Assuming the video shows that it is the Taurus just before it was dropped off on March 14th, the court does not find the video probative to the issues before the court.

 Easter used the alias of “Corey” Easter in 2011 when he took Thomas to the hospital after Thomas had been stabbed.

 This number was never provided to Ms. Mercurio.

 Easter has been represented by counsel throughout this case. A reasonable inference can be drawn that, through his counsel, Easter was aware that Lora had asserted a Fifth Amendment privilege and was not going to testify against him. This knowledge of Lora’s unavailability dispels the Commonwealth’s argument that Easter had a motive to “prevent” Lora from testifying.

 The fact that Easter was wearing a gray hoodie when stopped by Boston police on March 8th is of no probative value on this issue.

 Heading away from 8 Forbes Street.

 No evidence was presented that Easter knew where McKeon and Lora resided. In fact, a protective order was issued by this court in December 2013 (Lemire, J.) in which the defendant was prohibited from having access to any information as to the whereabouts of the witnesses.

 It is equally plausible that the phone’s battery died.

 The Commonwealth also argues that Easter’s failure to report to his probation officer is evidence of a consciousness of guilt. The court cannot assume that a failure to report to probation is evidence of consciousness of guilt.